# UNITED STATES MORTGAGE & TRUST COMPANY, Appellant, v. CRUTCHER et al.

### Division One, June 28, 1902.

1. **Parties to Action:** REAL PARTY. If upon the undisputed evidence the plaintiff is not the real party in interest, he is not entitled to maintain the action, and a judgment for defendant will not be disturbed on appeal whatever errors were committed at the trial.

2. ———: ———: FRAUDS: LOANS: AGENTS: REPRESENTATIONS OF DEFENDANTS. In order for a mortgage company to be entitled to hold defendant, in an action of fraud and deceit, for the representations made by defendant to loan agents upon whose recommendation and through whom the company made the loan, yet whom it denies are its agents, it must show that it adopted the acts of such loan agents and parted with its money, to a swindler, on the faith of defendant's representations. It is not competent for the principal to deny the agency and to deny its responsibility to the agent for the loss, and still take advantage of representations made to the agent and sue the person making them, for damages.

3. ———: ———: ———: ———: ———: CASE STATED. Loan agents were authorized to submit to plaintiff, a mortgage company, applications for loans. The company determined for itself in each instance whether it would make the loan or not, and the loan agents' commissions, as a general rule, were paid by the borrowers, as was done in this transaction. The defendants, who were real estate agents, were applied to by a swindler, who impersonated the real owner of valuable real estate, to aid him in an exchange of certain properties, and to pay the "boot," asked that they secure him a loan of $9,000. They spoke to the loan agents about the matter, and they had the swindler to apply for the loan in the name of the real owner, believing him to be such, and recommended the loan to the company, which authorized them to make it. The defendants made no recommendation to the company whatever, but, knowing nothing of the character of the swindler, indorsed the draft which

the loan agents had drawn on the company, as did also the swindler. Soon after the loan was made the fraud was discovered, but the loan agents ásked the company to pay the draft, which it at first refused to do, but afterwards did on request of the loan agents and under an agreement with them that suit should be brought by it against the defendants, and that the liability of the company and the loan agents should subsequently be adjusted by arbitration, but neither it nor they have ever admitted liability therefor. *Held,* that, until the company and the loan agents have settled the liability between themselves, and until the company has finally and absolutely paid its money in discharge of the loss, and taken the burdens incident to the ratification of the acts of the loan agents, it is not entitled to the benefits that might accrue from a suit against the defendants for fraud and deceit.

Appeal from Jackson Circuit Court.—*Hon. Edward P. Gates,* Judge.

AFFIRMED.

*C. O. Tichenor* for appellant.

The plaintiff can recover for this deceit. This loan was made exactly as all other loans had been made by these agents. The false representations were made to them as agents and while engaged in their duties as such. They were made to them, not to get a loan from them, but from this plaintiff. When they were deceived, they were deceived as agents of plaintiff—deceived in making this loan for plaintiff. Plaintiff was consulted as to this loan and consented to it, believing everything was honest, so believing because the belief of its agents was its belief. If it can not recover it must be by reason of something done after the loan was made. And what was this? Simply that plaintiff and its agents would arbitrate the question whether they were liable to their principal because they made this loan; they did not admit their liability, and such liability could be claimed only because the loan was the loan of plaintiff. If there had been doubt about this, that was removed by this transaction. Under such cir-

cumstances it would have amounted to a ratification of what had been done by their agents. In so far as they and plaintiff are concerned, there was nothing illegal, and, hence, it could be ratified. Porter v. Wood, 138 Mo. 539; In re Estate Soulard, 141 Mo. 661. "One can sue for the damages because of deceit and let the contract stand, or he can sue to rescind and receive back the money paid." Nauman v. Oberle, 90 Mo. 666.

*Harwood & Meredith* also for appellant.

(1) One representing himself to be the agent of another is responsible for the damage resulting to a third party dealing with him as such agent, if his representation be untrue, even though he believed it to be true. Story on Agency (9 Ed.), 264; Mechem on Agency, secs. 542, 545; 1 Am. and Eng. Ency. Law (2 Ed.), 1125; Wright v. Baldwin, 51 Mo. 269; Lingenfelder v. Letchen, 134 Mo. 63; Mantz v. Maguire, 52 Mo. App. 136; Myers Tailoring Co. v. Keeley, 58 Mo. App. 495; Collen v. Wright, 8 El. & Bl. 647, 92 E. C. L. 647; Weare v. Gove, 44 N. H. 196; Kroeger v. Pitcairn, 101 Pa. St. 311. (2) In such case the agent can not relieve himself from liability by paying over the money to his pretended principal. Ashley v. Bird, 1 Mo. 640, 2 Mo. 107; U. S. v. Pinover, 3 Fed. Rep. 305; 1 Am. and Eng. Ency. Law (2 Ed.), 1135; 14 Id. 153; Mechem on Agency, sec. 573; Moore v. Shields, 121 Ind. 272; Reed v. Peterson, 91 Ill. 288. (3) One who makes a false representation of a material fact as of his own knowledge, believing it to be true but in ignorance of the truth, for the purpose of inducing another to act thereon, is responsible for the damage resulting. 14 Am. and Eng. Ency. Law (2 Ed.), 91, 95; Hamlin v. Abell, 120 Mo. 188; Herman v. Hall, 140 Mo. 270; Huston v. Tyler, 140 Mo. 252; Clinkenbeard v. Weatherman, 157 Mo. 105; Caldwell v. Henry, 76 Mo. 254; Dulaney v. Rogers,

United States Mtg. & Trust Co. v. Crutcher.

64 Mo. 201; Rothchild v. Mack, 115 N. Y. 91; Chatham
Furnace Co. v. Moffatt, 147 Mass. 403; Babcock v. Osmer,
153 N. Y. 608; Kountze v. Kennedy, 147 N. Y. 130; Moline
Plow Co. v. Carson, 72 Fed. 392; Wheeler v. Baars, 33 Fla.
711.

*Johnson & Lucas, Edward C. Wright* and *Frank Hager-
man* for respondents.

Plaintiff neither paid nor lost any money by reason of
any act of defendants.   On the contrary, any money paid was
voluntarily advanced or loaned to the Mackenzies on their
agreement to arbitrate the question of liability and to secure
the result of the arbitration.   The suit against Crutcher &
Welsh is merely lending the name of the mortgage company
to the Mackenzies to speculate upon the chances of a recovery
against Crutcher & Welsh.   (a)   Fraud and deceit never
give a right of action unless a person relies and acts upon the
fraudulent representations.   A plaintiff must part with his
money on the faith thereof; otherwise he has no case.   14
Am. and Eng. Ency. Law (2 Ed.), 106, 109, 110.   (b) It
is perfectly apparent that in this case the mortgage company
parted with nothing on the faith of the representations com-
plained of.   It paid the draft, or, rather, gave the Macken-
zies an apparent credit therefor, on the faith of their promise
to arbitrate the question of liability; and of their apparent
deposit of $5,000 to secure the result of the arbitration.   At
a time when they had lost nothing, the Mackenzies induced
it to experiment with a lawsuit against Crutcher & Welsh.
In plain words, it loaned to the Mackenzies the credit of
$9,000 pending, and for the purpose only of a pretense of loss
in the suit against Crutcher & Welsh.

MARSHALL, J.—This is a common-law action of fraud
and deceit, to recover $8,670 damages.   There was a verdict
and judgment for the defendants, and plaintiff appealed.

The case is quite unusual. It grows out of a novel and successfully-worked swindle. The details read more like a diaphanous plot of a dime-novel story, than like a real transaction of the twentieth century. The defendants, Crutcher and Welsh, are among the largest real estate agents in Kansas City, and it is conceded that they are men of high standing and excellent business qualities and reputation, and that they were honest and innocent and acted in perfect good faith in all their acts connected with the transaction. The plaintiff is a New York corporation and was engaged in lending money in Kansas City and elsewhere. J. and W. C. Mackenzie are extensively engaged in business, as loan agents, in Kansas City, and it is also conceded that they are men of high standing and excellent business qualities and reputation, and that they were honest and innocent, and acted in perfect good faith in all their acts connected with the transaction. They were not the general agents of the plaintiff, but whenever they found a customer who wanted to borrow money, they caused him to make out an application to the plaintiff for a loan, they examined the security offered and forwarded it to the plaintiff, with their recommendation. If the plaintiff accepted the application, it notified them, and they prepared the mortgage and caused the borrower to execute it to the plaintiff, and then drew a draft on the plaintiff in favor of the borrower for the money, and caused the borrower to indorse the draft. Sometimes, as was done in this instance, instead of waiting until the draft was forwarded to New York and collected, the Mackenzies would give the borrower their individual check for the money, and deposit the draft to their own credit. The Mackenzies usually got their pay from the borrowers, but on several occasions the plaintiff paid them for extraordinary services. L. P. Wiel lived in California, and owned a building on Sixth and Walnut streets in Kansas City, which was rented to Phillip McCrory, and used by him for store, saloon and hotel purposes. Weil's brother-in-law, Joseph

Nachman, a grocer in Kansas City, looked after the property and collected the rents. These are the honest parties connected with the transaction.

The dishonest conspirators, who worked the swindle upon the honest parties, were, first J. W. Kline (now in the penitentiary for his part in the swindle), who operated under the name of L. P. Weil, and later as H. Watts; second, James M. Kline, whose real name was William Hill, and who was a professional confidence man; third, Philip McCrory, the tenant, John McGovern, and James Pryer, who were the general conspirators in the case.

The following statement of the defendants fairly and fully sets out the facts adduced at the trial as to the manner in which the swindle was perpetrated:

"On July 1, 1898, the defendant received through the mail in the ordinary course of business a letter from L. P. Wiel, dated Omaha, Nebraska, specifically describing a building owned by him, its tenancy, saying he had seen their advertisement and asking what commission would be charged for its sale, saying he would sell for $40,000, perhaps $36,000. On July 6th, Crutcher & Welsh answered the letter in detail, giving their opinions as to the prospects of sale and the commission which would be charged if a sale were made, suggesting, however, that the entire charge of the building and its rentals should be given them, as it would aid them in finding possible purchasers. On the same date Weil again wrote them calling attention to his former letter, suggesting that it had probably miscarried, and making similar inquiry. On July 10, Weil wrote giving detailed informations as to rentals and insurance, saying he did not want to secure an agency for the rental of the building but only wished to put it on the market and thought possibly they could get a buyer. To this letter defendants, on July 12th, replied that they would do what they could to get a buyer. On July 19th Weil wrote adroitly sug-

gesting that he personally had been offered a trade for some property by James Kline, who might give $8,000 to $10,000 to boot, and asking if he sent Kline to them would they negotiate the trade, charging a commission only on the '$8,000 to $10,000 given to boot,' and saying otherwise he would go to Kansas City and attend to the trade himself. Defendants, taking the bait, on July 20th wrote Weil that they would accede to his conditions. July 22d Weil wrote authorizing a trade with Kline for $7,000 to boot if no more could be obtained, authorizing the procuring of an abstract if sale was made, and saying he would give Kline a letter of introduction to them. July 23d Weil wrote a letter of introduction to Kline, directing defendants to show him the property and carry on negotiations with him. Negotiations were entered into and Kline was shown the property, all of which finally resulted in his offering to trade his Omaha property for Weil's Kansas City property, and give $8,000 in cash to boot, which offer Crutcher & Welsh at once communicated by letter and wire. Weil answered authorizing a sale if Kline would assume taxes, telling defendants to draw on him for the cost of abstract or to take it out of the purchase price with the commission and to send him deed for execution by himself and wife, saying, the latter being sick, he wanted to take her to California as soon as possible. On July 28th defendants wrote that they had, as instructed, arranged with Kline, who was to obtain a loan of $8,000 on the property in order to pay him cash. At Kline's request, Crutcher & Welsh called up several loan agencies to see if they would make to Kline a loan on the property which he was purchasing, so as to enable him to pay the $8,000 to Weil. Among these agents were Mackenzie Brothers, who looked at the property and undertook to make the loan, Welsh stating to them that Kline represented he was trading with Weil for the property upon which he wanted to make the loan. Welsh took Kline to Mackenzie, who filled up a written application to the mortgage company,

which he required Kline in person to sign, Welsh being asked
to sign nothing.   This application was actually in writing,
giving the minutest details, and signed by Kline, who stated
at one place therein he was 'going to purchase' the property
and, at another he was the 'owner.'   There was indorsed on
this application a report of J. and W. C. Mackenzie to the
company, going into detail, saying, among other things, that
Kline had a warranty deed, that his claim was not adverse to
the owner and that 'we think Mr. Kline will be a good bor-
rower, as all his other property is free of debt.'   The date of
these papers was July 28, 1898, and on that date the Macken-
zies wrote the mortgage company inclosing the application and
saying 'this is a first-class loan and we trust that it will meet
the approval of the directors.'   Welsh prepared a deed and
sent it to Wiel for execution, writing on July 30th, inclosing
the deed.   He also ordered an abstract of the property and had
it sent to the Mackenzies.   Upon the return of the deed, Mr.
McLeod, Mackenzie's lawyer, found some technical objections
and it was sent back, the letter returning it being dated on
August 5th.   August 4th Wiel wrote defendant that he had
closed with Kline for the Omaha property and nothing re-
mained but for Crutcher & Welsh to close the transaction and
collect the $8,000 at Kansas City.   On August 4th the mort-
gage company wired Mackenzies that the Kline loan was ac-
cepted.   On August 5th Kline executed the notes and mort-
gage, acknowledging the latter before E. B. Nelson, an em-
ployee of Mackenzies, whose certificate of acknowledgment
states that Kline was to him 'known to be the person described
in and who executed the foregoing instrument.'   On August
6th, Wiel wrote the defendants inclosing the deed which had
been corrected, duly executed and acknowledged before a no-
tary public of Douglas county, Nebraska.   This was deliv-
ered to Mr. McLeod, who approved it.   Mackenzies met Kline
and Crutcher to close the transaction.   It was closed thus:
A draft for $9,000 was drawn by the Mackenzies on the mort-

gage company, payable to the order of Kline and by him in-
dorsed to them.    This was on August *5th*.    The Mackenzies
on August *9th* drew two checks of their own for $8,000 and
$678, respectively, payable to the order of Kline. The Wiel
deed had before this on that day been placed of record. Kline
was borrowing $9,000, but $328 was deducted, covering the
commission of $315 and some items of expense.  Although
Crutcher requested Mackenzies so to do, they refused to make
either check payable to Crutcher & Welsh because they wanted
'to see it on the face of the paper itself that the money or the
check went to the man who was making the loan.'   Kline then
went to Crutcher & Welsh's office and indorsed the two checks.
That for $678 was cashed by Crutcher & Welsh, they deduct-
ing therefrom $150 for an insurance premium for insurance
written on the building, Kline getting in cash $528.    The
check for $8,000 was indorsed in blank by Kline, whereupon
Crutcher & Welsh indorsed it.    Defendants then deposited
both checks in bank and obtained a certified check for $7,760
which they sent to Wiel by letter of August 9th, the difference
of $240 being retained to cover $200 commission for sale of
the real estate, and $40, the amount expended for an abstract.
The confederate, James M. Kline, whose real name was J.
W. Klime, got from the postoffice defendants' letter inclosing
to Wiel a certified check for $7,760 and under the name of
H. Watts cashed it.   He was enabled so to do in this way:
Wiel, on August 10th, wrote defendants acknowledging receipt
of the check, and saying he had turned it over to H. Watts,
who was on his way south and would collect it.   Watts's story
is that he then went to Crutcher with the letter saying that
he had some dealings with Wiel and was on his way south
and would like to change the defendants' certified check to a
draft, and that he and John McGovern indorsed, and Crutcher
'O. K'd' it, whereupon Watts got the cash.   Crutcher, hear-
ing that Watts had obtained the cash on the certified check,
instead of getting a draft for it, thought that Wiel had in-

·dorsed the check and Watts had improperly obtained it. His suspicions being aroused it was learned that the whole trans-action was a fraud. This was on August 11th. After the swindle was accomplished the Mackenzies followed the crime to this extent and with this success:

"J. W. Kline, who personated Watts, was arrested and pleaded guilty, and received a two-year sentence. Hill was never caught. Whether anything was done as to the other ·conspirators the record does not show.

"When J. W. Kline, or Watts, was arrested the Mac-kenzies got from him $550 of the money collected · on the Crutcher & Welsh check, and they also got of this same money $1,000 from some one designated as the 'Watts woman.' De-fendants returned to the Mackenzies $150 of insurance money which they had collected, such being the amount defendants received from Kline out of Mackenzies' check for $678. This $150 was without protest accepted.

"When defendants asked Mackenzie to make the Kline loan, the arrangement between them was that they were to charge Kline for making the loan, three and one-half per cent commission, of which they were to get two per cent and give Crutcher & Welsh the balance. This they did, collecting from Kline $315, and giving defendants a check for $135 for their part of the commission. Such a division was customary when a broker brought a borrower to the Mackenzies.

"Crutcher & Welsh received net out of the transaction these amounts: $150 for insurance, $200 for a commission on the sale of Wiel to Kline, $135 commission paid by Mac-kenzies and $40 paid for abstracts. The $150 for insurance was repaid to and accepted by the Mackenzies. The balance of $335 they offered to repay to the Mackenzies and to permit them to accept it without prejudice, which they refused to do."

It will be noted that the Mackenzies gave their checks to James M. Kline (Hill) on August 9th, and that James M.

Kline indorsed them to the defendants, and that defendants cashed the check for $678, deducted $150 to pay for the insurance on the building, and gave James M. Kline the balance, $528, in cash. On the same day the defendants deducted the $200, their commissions on the "boot," and the $40 for the abstract, from the $8,000, and sent the balance $7,760 to the fictitious L. P. Wiel (J. W. Kline) at Omaha, who on August 10th, acknowledged the receipt thereof, and notified the defendants that he had turned it over to H. Watts, who was on his way south and who would collect it. Watts (the fictitious Wiel, and in realty J. W. Kline) turned up in Kansas City on the 11th with the check for $7,760, and succeeded in getting it cashed. Within half an hour after it was cashed the swindle was discovered, and an attempt made to stop payment of the check, but it was too late. The Mackenzies had forwarded the mortgage and the draft for the $9,000 to the plaintiff but it had not reached the plaintiff or been paid when the swindle was discovered, and before it was received or paid the plaintiff was fully notified of the swindle. On August 11th the Mackenzies telegraphed the plaintiff that the Kline title was probably a forgery, but saying "please honor draft." On August 12th, the Mackenzies wrote the plaintiff a detailed statement of the transaction. On August 13th, the plaintiff refused to pay the draft and returned all the papers to the Mackenzies.

"On August 15th the Mackenzies wrote acknowledging receipt of the papers and saying their lawyer and one of their firm would call on the plaintiff 'and discuss the situation.' On August 23d the Mackenzies wrote saying the attorney for the mortgage company refused to do anything about the Kline matter and insisted that the question of liability as between them should be arbitrated and saying while they 'reluctantly consent' to so arbitrate, that they will only consent so to do upon a condition thus expressed: 'In agreeing to arbitrate this Kline question we do so on condition that you agree to

at once put yourselves into a position to sue Crutcher & Welsh, as at present neither your company nor we can do that. It will be necessary for you to pay the draft we made, and if you so desire we can deposit the money pending the arbitration.'

"August 26th plaintiff wrote Mackenzie, speaking of a conference with his brother, the result of the propositions made not having yet been determined because of the absence of one of the officers. These propositions never appeared in any of the correspondence, for the reason that the parties failed to show any written agreement. August 29th the Mackenzies wrote urging reasons why Crutcher & Welsh should be sued. September 8th plaintiff wrote giving Mackenzies credit for $9,000, and on September 10th the Mackenzies wrote: 'We understand from our Mr. W. C. Mackenzie that under a certain arrangement with you, you have paid the Kline draft so that we send it you herewith to have it stamped paid and return to your attorneys here as it will doubtless be required in evidence. We have all the other papers here and will dispose of them as you desire.'

"This letter was answered thus:

" 'MESSRS. J. & W. C. MACKENZIE,
    " 'New England Building,
      " 'Kansas City, Missouri.

" 'Gentlemen: Your favor of the 10th inst. has been duly received, inclosing draft for $9,000 made in the matter of the Kline loan, and requesting us to have the same stamped "paid" in the usual way and return to you. We have done so, and I now beg to return the draft to you herewith. It is understood of course, that in accordance with the terms of the agreement affected with Mr. W. C. Mackenzie, this payment is made without prejudice to our rights, and that stamping the draft "paid" is done in the pursuance of this arrangement

to facilitate such action against other parties as may be deemed advisable.    " 'Yours very truly,
' "ARTHUR TRUMBALL, Treasurer.'

"On October 4th the company wrote authorizing the employment of counsel in the suit against Crutcher & Welsh, 'the expense of which is to be apportioned later under the general arbitration agreement in reference to the Kline matter.'

"November 22nd the company wrote Mackenzies inclosing an attorney's bill for expenses, saying: 'Inclosed we hand you bill of Messrs. Harwood & Meredith for various expenses in connection with the Kline loan, which we would suggest that you pay in the same manner as you have been paying other expenses. We presume that this will be satisfactory to you. As the matter of these expenses is to be arbitrated, we have suggested to Mr. Harwood to send his future bills for expenses in this matter to you.'

"On November 25th, Mackenzies wrote asking the company to advance these and future expenses in the litigation, to which assent was given. This ended the correspondence between plaintiff and Mackenzies, and the arrangement by which the credit was given, if oral, was with W. C. Mackenzie and must be extracted from his testimony; if in writing, it was for some reason not disclosed.

"W. C. Mackenzie testified upon this subject by deposition and afterwards under cross-examination, and there was extracted from him in substance this: The real agreement, as told in his deposition was: Suit was to be brought by the company against Crutcher & Welsh; Mackenzies were to get credit for the $9,000 Kline draft; the question of liability as between the company and them was to be arbitrated and they deposited with the company $5,000 to secure the result of the arbitration. This agreement was signed in duplicate by both parties and the $9,000 draft paid 'a few days after the loan was closed up.' In his cross-examination at the

trial his story was this: The Kline draft was not paid till September 8th. He and plaintiff's president were together alone and made a verbal agreement; 'purely a verbal thing,' no writing passed except a receipt signed by the company for $5,000, deposited by Mackenzies, 'to be held by us pending arbitration of the Kline loan,' the real contract was that the company was to pay the Kline draft; the question as to whether the Mackenzies were liable to the company should be arbitrated between them some time in the future; the Mackenzies were to, and did, deposit $5,000, to secure the result of the arbitration, and in the meantime plaintiff was to sue Crutcher & Welsh."

Although it is not material to the decision of this case, the tale would be but poorly told unless it was stated how the swindle was discovered so soon after the money had been paid. When the defendants learned that Watts, alias L. P. Wiel, alias J. W. Kline, had gotten cash instead of a draft from the bank in lieu of the certified check, they became suspicious and thought Watts had improperly obtained possession of the certified check from Wiel. They thereupon went to see the insurance agents who had the insurance upon the property, and there learned that the true Wiel lived in California, and were shown his signature to letters they had from him, which was altogether different from the signature of the fictitious Wiel written to the defendants. Thus it was discovered that the whole thing was a swindle.

It seems that neither the defendants nor the Mackenzies ever asked Joseph Nachman, the brother-in-law of the real Wiel, and his agent in Kansas City, anything about the true Wiel or the sale of the property, or whether the signature to the letters was genuine or not.

I.

Counsel for the respective parties have filed exhaustive and comprehensive briefs, showing great learning and deep

research. The principal point discussed by counsel is whether, in an action of fraud and deceit, the defendant must be shown to have been *conscious* that the representation was false or was made without knowing whether it was true or false and with a consciousness that he did not know whether it was true or false. But in the view herein taken of this case it is unnecessary and would be improper to consider this very interesting question about which there is, perhaps, more difference of opinion and adjudication than upon almost any other question in the law.

Upon the undisputed evidence in the case, this plaintiff is not the real party in interest and is not entitled to maintain this action. The judgment is, therefore, in favor of the right party and whatever of error is presented otherwise by the record is immaterial. [Sec. 865, R. S. 1899.]

The Mackenzies were not the general agents of the plaintiff. They were only authorized to submit to the plaintiff applications for loans. The plaintiff determined for itself in each instance whether it would make the loan or not. The Mackenzies were paid for their services by the borrowers, as a general rule, and as was done in this case, and the plaintiff never paid them anything except for extraordinary services. The defendants made no representations whatever to the plaintiff, and the plaintiff never acted upon any representation of the defendants. The plaintiff acted upon the written application of James M. Kline (William Hill) for the loan, and the written report of the Mackenzies. Before the plaintiff had an opportunity of parting with any money or thing of value, the swindle was discovered and the plaintiff was fully informed thereof. Then on August 13th the plaintiff refused to pay the draft and returned it, with all the papers to the Mackenzies. Then negotiations were entered into between the Mackenzies and the plaintiff, which resulted in an agreement that the Mackenzies and the plaintiff would at some future time arbitrate the question of whether the

plaintiff was bound to pay the draft for $9,000 that the Mackenzies drew on the plaintiff in favor of Kline and had him indorse to them, and that the plaintiff should give the Mackenzies credit for the nine thousand dollars and stamp the draft as paid so it could be used in a suit against the defendants, and that the plaintiff should bring this suit against the defendants, and that to secure the plaintiff and to bind the Mackenzies to abide by the result of the arbitration hereafter to be had to determine whether the plaintiff or the Mackenzies shall stand the loss of the nine-thousand-dollar draft, the Mackenzies deposited five thousand dollars with the plaintiff.

Regarding the transaction as amounting to a payment by the plaintiff of the nine-thousand-dollar draft, as to which, however, there is ample room for doubt, it can not be regarded as a final, absolute or unconditional payment such as would be necessary in any case to afford a basis for such a suit as this. Neither the Mackenzies nor the plaintiff have yet admitted that they were liable to the other. That question is expressly reserved for future arbitration, and the Mackenzies have already deposited with the plaintiff five thousand dollars to secure the plaintiff against loss if the arbitrators find that they must stand the loss. So far, therefore, the rights of the plaintiff and the Mackenzies *inter sese* are not settled. All that they have settled is that the plaintiff shall sue the defendants, and that they shall give the Mackenzies credit for nine thousand dollars and stamp the draft as paid so it can be used in court, and that the plaintiff shall hold the five thousand dollars deposited with it by the Mackenzies.

Until the plaintiff and Mackenzies settle the differences between them, and until the plaintiff has finally and absolutely paid its money in discharge of the nine-thousand-dollar draft, and taken the burdens incident to a ratification of the acts of the Mackenzies, it is not entitled to the benefits that might accrue from a suit against the defendants. In other words,

before the plaintiff can successfully contend that it is entitled to hold the defendants for the representations made by the defendants to the Mackenzies, it is absolutely prerequisite that it shall show that it adopted the acts of the Mackenzies and parted with its money on the faith of the defendants' representations.

It is undoubtedly true that a principal can take advantage of representations made to his agent, which were acted upon by the agent for the principal or by the principal and which resulted in loss to the principal. But it is not competent for the principal to deny the agency and to deny his responsibility to the agent for the loss, and still take advantage of representations made to the agent and sue the person making the representations to the agent for damages. Not only does it appear that the plaintiff denies that it is liable to the Mackenzies for the nine thousand dollars, and has reserved the right to arbitrate that question, and has demanded and received a deposit of five thousand dollars from the Mackenzies, but it also appears that the plaintiff demanded that the Mackenzies pay the expenses growing out of the Kline loan and swindle, and that the plaintiff, at Mackenzies' request, only agreed to *advance* such expenses and the expenses of litigation, and the question of which of them should ultimately pay them be left for settlement by the arbitration.

Upon such a showing the conclusion is unavoidable that the plaintiff has shown no right in itself, as yet, to maintain this action. This being true and the verdict of the jury being for the right party, the judgment of the circuit court is affirmed. All concur.